JAMES G. BARRY, Appellant, v. AUGUSTUS A. BLUMENTHAL, Respondent.

*Confirmation.*—Acts 1812 & 1816. A confirmation by virtue of the first section of the act of Congress of June 13, 1812, is a better title than a confirmation under the act of April 29, 1816.

*Survey.*—The private claims within the village of Carondelet, although included within the survey, must be understood to be excepted from the confirmation of commons to the town, and it was properly left to the jury to find whether the premises sued for had been used by the inhabitants as a part of the common of the village.

*Limitations—Confirmation by Act of 1816.*—Aubuchon v. Ames, 27 Mo. 89 ; St. Louis University v. McCune 28 Mo. 481, and McCune v. O'Fallon, 32 Mo. Affirmed.

*New Trial.*—An application for a new trial, on the ground of newly discovered evidence, must show that due diligence has been used.

*Appeal from St. Louis Land Court.*

For statement see the opinion of the court.

*Casselberry*, for appellant.

I. The plaintiff claims title by intermediate conveyances from William Russell, to whom the land in controversy was confirmed by the act of Congress of April 29th, 1816, as a "lot in Carondelet." The defendant claims by intermediate conveyances from the corporation of the town of Carondelet; and by a far-fetched construction of the United States surveys of the common of Carondelet, the defendant pretends that said surveys are evidence against the plaintiff, to show that the land in controvery was confirmed to the town, as common, by the act of Congress of 1812, because said surveys include the town.

3—VOL. XXXII.

To rebut the pretended inference that the land in controversy was common, the plaintiff read in evidence a connected plat of the town of Carondelet, compiled by the surveyor general. This plat shows the location of the town, as it existed during the Spanish government, and it also shows that the premises in controversy are within the town, as it existed prior to December 20th, 1803.

There could not be common of a town without there being at the same time a town, any more than there could be two hills without a hollow or valley between them. The surveys of the common for the town were for the benefit of the proprietors of the town, and not for their destruction. In the case of Primm v. Haren, (27 Mo., p. 209,) this court remarked that "a claim for commons within the boundaries of a survey, is not inconsistent with the idea of private claims within its limits. Then the fact is known that a claim to commons is not necessarily hostile to private claims within its limits."

In addition to the connected plat of the town alluded to, the plaintiff read in evidence five confirmations of town lots and the surveys thereof. The lots therein confirmed respectively were town lots in the town of Carondelet during the Spanish government. By reference to the surveys of these confirmations and the connected plat of the town, it will be seen that they surround the premises in controversy, plainly showing that the premises were obviously within the ancient town, and that the land in dispute cannot, with any degree of seriousness, be considered as common. These five confirmations are *prima facie* evidence. See cases of Vasquez v. Ewing, 24 Mo. 38; Biehler v. Coonce, 9 Mo. 347; Macklot v. Dubreuil, 9 Mo. 477; Boyce v. Papin, 11 Mo. 16; McGill v. Somers & McKee, 15 Mo. 80; and Carondelet v. St. Louis, 29 Mo. 527. The connected plat of the town, above alluded to, is also evidence. See the case of Fine v. Schools, 30 Mo. 166.

II. The common ought to have been surveyed in two separate tracts. One survey beginning at the upper end of the

town and running northward, and the other survey beginning at the lower end of the town and running southward; and all vacant or unconfirmed pieces of land between the two surveys ought to have been assigned to the Schools, under the second sections of the acts of 1812, 1824, and 1831. If this had been done, the trouble which has occurred in this suit would never have happened.

We admit that those claiming under the act of Congress of the 4th of July, 1836, cannot dispute the common title, because the second section of the act provides that it shall not operate as a confirmation of any land which had been " previously located under any law of the United States, or had been surveyed and sold by the United States." As the common was surveyed, and the survey approved in 1834, the land therein had emphatically been " previously located under a law of the United States," according to the decision of the Supreme Court of the United States, in the case of Les Bois v. Bramell, (4 How. p. 463.)

The difference, therefore, between the act of 1836 and all, of the prior acts confirming lands, is very broad, plain and obvious. The prior acts (including the act of 1816, which confirmed the land in dispute,) make no such exceptions or reservations as are made in the act of 1836, nor are there any lots in the old French or Spanish town confirmed by the act of 1836. The acts of 1812 and 1816 confirm the lots and lands therein alluded to in a direct and positive manner, without any exceptions or reservations. At the time of the passage of the respective acts of 1812 and 1816, the rights of the confirmees vested, (but were not complete until their survey, where the boundaries were indefinite,) and could not be divested by the surveyor general in making the survey of the common. The powers of the surveyor general, in this respect, were amply explained by the Supreme Court of the United States in their decision last winter, in the case of the Commissioners of the Sixteenth section against John B. Hortez and others, in which the court said that the duties of the surveyor general are of " purely a ministerial function. His

neglect could not suspend the vesting of the titles granted, much less his blunders forfeit them."

III. The survey of the common is binding and conclusive evidence on the corporation and on the United States, because they are parties to it, and are respectively estopped and bound thereby. (See Menard v. Massey, 8 How. 293 ; Kissell v. Schools, 18 How. 19, and Carondelet v. St. Louis, not yet published.) And the survey of the common is binding and conclusive on mere squatters, or intruders, or trespassers, and others having no title acquired from the United States, because, having no title acquired from the United States, they are not in a condition to dispute the survey. If the survey is wrong, they are not injured, as they have no rights to be injured, and no one is allowed to complain in a court of justice in any case, except those who are injured. (See Boyce v. Papin, 11 Mo. 16; and Archer v. Bacon, 12 Mo. 149.) But a person holding title under a valid confirmation in the old town, can dispute the survey of the common, because he has a lawful right, recognized by Congress, of which he cannot be deprived by the surveyor-general. (See the case of Primm v. Haren, 27 Mo. 209; and the case before-mentioned of the Commissioners of the Sixteenth section v. Hortez and others, not yet published.)

The common was surveyed and approved in 1834, and none of the private confirmations were surveyed or approved before 1835. From the year 1835 to 1855 the surveys have been from time to time made, recorded and approved, being a space of more than twenty years, as appears from the surveys read in evidence in this case.

The conclusion, therefore, is correct to which the Supreme Court came to, in the case of Primm v. Haren, (27 Mo. 209,) that the survey of the common was never intended to interfere with any rights under confirmations. The court below, therefore, erred in not giving the fifth instruction asked for by the plaintiff, and in giving the first instruction asked for by the defendant.

IV. We contend that the court below erred in not giving

the fourth instruction asked for by the plaintiff, the effect of which is, that the statute of limitations did not begin to run against the plaintiff until the year 1854, when the survey (125) was made of the land in suit, on account of the boundaries being so uncertain that the title attached to no land until the survey defining the boundaries was made; and, inasmuch as the survey was not made ten years before this suit was brought, the statute of limitations had no application to this case.

That a survey was necessary to define the boundaries there can be no doubt. This can be easily seen by reference to the papers in this case. The notice of claim filed by Wm. Russell, dated November 12, 1812, calls for Second street on the east and the field on the west, but the north and south boundaries are not given.

It has been frequently decided by the Supreme Court of the United States that where the locality or boundaries of a confirmation are indefinite, or cannot be ascertained without a survey, the title attaches to no land until a survey is made. (See Massey v. Menard's heirs, 8 How. 293; West v. Cochran, 17 How. 403; Stanford v. Taylor, 18 How. 411; Lafayette's heirs v. Kenton and others, 18 How. 197; Carondelet v. St. Louis, not yet published; and Magwire v. Tyler and others, not yet published.

V. The first instruction asked for by the defendant ought not to have been given, because there was no evidence to support it. The land is within the town as it existed prior to 1803. At one time it had a barn on it, and at another a house, and seems always to have been treated as a town lot in the town.

VI. The second instruction asked for by the defendant ought not to have been given, because the land was confirmed to Russell, and not to Bombardier, and the deed from Bombardier to Easton is void for want of certainty as to the description of the lots conveyed. The United States held the title and granted it to Russell, and not to Bombardier, and we are governed exclusively by the grant to Russell. The

effect of the instruction was to go behind a confirmation and treat the title of Bombardier as valid, when he never had any thing more than an *inchoate* right, of no standing in a court of law or equity.

VII. The fifth instruction asked for by the defendant ought not to have been given for many reasons. It allowed the statute of limitations as a defence, which ought not to be allowed, for the reasons hereinbefore given. It allowed the jury to determine whether the confirmation by the United States to Russell had boundaries or not, which is a question of law, to be determined by the court. *What* boundaries are, is a question of law for the court to decide, and *where* the boundaries are, is a question of fact to be decided by the jury. (See the case of Whittelsey v. Kellogg, 28 Mo. 404.) It allowed the jury to ascertain the boundaries of the land in suit. The ascertaining and fixing of boundaries are not judicial acts, and cannot be lawfully performed by either court or jury. The fixing or defining boundaries is an executive act, and must be performed by the surveyor general. (See cases of West v. Cochran, 17 How. 403; Kissell v. The Schools, 18 How. 19; and Ballance v. Forsythe and others, 24 How. 185.)

VIII. A new trial ought to have been granted on the affidavits read in support of the motion for a new trial, for reasons which are sufficiently manifest on inspection of the affidavits.

*F. A. Dick*, for respondent.

I. The instructions given authorized the jury to find for the plaintiff, unless they believed the defence set up was sustained by the evidence, and there was no error in refusing those asked by plaintiff.

II. The first instruction for defendant merely declared that a confirmation to Carondelet of June 13, 1812, was a better title than one of April 29, 1816, to the plaintiff.

III. The second instruction for defendant told the jury that, to enable Russell to have the benefit of the confirmation to

Bombardier, he must have a conveyance from him. (Hogan v. Page, 22 Mo. 55, 66.)

IV. Instruction 5 merely repeated the law, as declared in Aubuchon v. Ames, 27 Mo. 89, that possession was a defence if prior to the survey the premises in quession had a definite location and limits.

BATES, Judge, delivered the opinion of the court.

This is an action, in the nature of an action of ejectment, commenced by the plaintiff, on the 29th day of April, 1857, in the St. Louis Land Court, for the possession of a part of survey 125, in block 84, in the former town, now city, of Carondelet.

The defendant, in his answer, denies all of the material averments in the petition, and sets up the statute of limitations; and also claims to be the owner himself of the premises in controversy.

The judgment of the court below was in favor of the defendant, and the plaintiff appealed to this court. At the trial in the court below, the plaintiff read in evidence a confirmation, under the act of Congress of the 29th of April, 1816, to William Russell, under Joseph Bombardier, and the notice of claim and documents accompanying the same from the United States recorder of land titles.

The notice of claim filed by Russell with the recorder is dated November 12, 1812, stating that, under the Spanish government and laws of Congress, he claims 120 French feet in front, be the same more or less, on the western side of the most western main street of Carondelet village, and extends westward from the said street to the common field lots 120 French feet wide, be the same more or less, to the distance from said street to the common field, and that all of which he claimed as assignee of Rufus Easton, who was assignee of Joseph Bombardier. Accompanying the notice, the claimant filed two deeds. One deed is from Joseph Bombardier to Rufus Easton, dated September the 5th, 1807, describing the property as two lots, in the village of Carondelet, with a log

house, stable and hen-coop thereon, situated on the third street of said village, being the same house and lots purchased of John Boli and Madam Bourdoin. And the other deed is from Rufus Easton to William Russell, dated January 7, 1812, describing the property as two certain lots of ground, situated in, and adjoining, the village of Carondelet, fronting on, and adjoining, Third street from the Mississippi river, admitting First street to be the bank of said river, bounded on the eastward by Third street, on the southward by a cross street, on the westward by the limits of the common field, and on the north by land unknown, supposed to contain two acres, being the same purchased of Easton, who purchased from Bombardier. There is no concession, or other documents, or written title, to the property in dispute, from the Spanish government, to any one.

The confirmation is to " William Russell, under Joseph Bombardier," and describes the property as a " lot in Carondelet, 120 feet front, back to fields," and refers to the book and page where the claim and accompanying documents are recorded; and adds these words, " granted to be surveyed according to possession."

The plaintiff read in evidence a notice of claim, filed by Easton with the recorder of land titles, dated June 27th, 1808, stating that he claims, as assignee of Bombardier, who is assignee of John Boli and Madam Bourdoin, two lots of ground, called village lots, in the village of Carondelet, on which there is a house, stable and hen-coop, on Third street, of said village.

The plaintiff then read in evidence survey 125, being a survey of the confirmation to William Russell, under J. Bombardier, before mentioned. This survey was made on the 15th of May, 1854, and finally recorded and approved by the surveyor general on the 16th day of June, 1854.

The plaintiff also read in evidence, the confirmation certificate of the recorder of land titles, in the usual form, dated June 23, 1854, stating that the confirmee is entitled to a patent for the land included in the survey.

The plaintiff then read in evidence a deed from William Russell to Thomas Allen, dated April 15, 1850, describing the property in the same manner as in the deed from Easton to Russell.

The plaintiff then read in evidence a deed from Thomas Allen and wife to James G. Barry, the plaintiff in this suit, dated April 18, 1850, with the same description as in the deed from Russell to Allen. The defendant admitted that he was in the possession of the premises in controvery at the time of the commencement of this suit.

The parties admit that the defendant, within three months after the commencement of this suit, appealed to the commissioner of the general land office from the decision and proceedings of Surveyor General Loughborough, in relation to ordering, making and approving of said survey 125, read in evidence; but the plaintiff at the same time protested against, and denied the right of, the defendant to appeal as aforesaid, and denied that said appeal had any effect on his right, title, or interest, in or to the premises in controversy. The record contains a copy of the report of the surveyor general to the commissioner of the general land office on the appeal.

The plaintiff then read in evidence, the decision of the commissioner of the general land office, dated October 26th, 1859, affirming the decision and proceedings of the surveyor general, but declining to grant a patent, as requested by the plaintiff, in consequence, as he said, of the *locus* of the survey (125) being involved in much doubt and uncertainty, but left the parties with the evidence of title in their respective possessions : that is, the plaintiff under his confirmation and survey, and the defendant under the corporation of Carondelet, to submit their rights for adjudication to the courts, and to that end, delivered the survey and the patent certificate to the plaintiff. The plaintiff, at the time of reading the decision of the commissioner, protested against any statement made therein.

The plaintiff here rested his case.

The defendant then read in evidence the acts of Congress of June 13, 1812, May 26, 1824, and January 27, 1831, and an act of the legislature of this State of February 13, 1833, authorizing the corporation of Carondelet to sell lots within the corporate limits of the town. The plaintiff excepted to the reading of said acts, on the ground of irrelevancy and incompetency.

It was admitted that the town of Carondelet was incorporated in 1832, and that the premises in controversy are with-in the limits of the corporation of 1832.

The defendant offered to read in evidence Brown's survey of the common of Carondelet, made in 1834; to the reading of which the plaintiff objected; but said objection was over-ruled and the same was read, and the plaintiff at the time excepted to the decision of the court in overruling said objection.

The defendant offered to read in evidence Rector's survey of said common, made in 1817; to the reading of which the plaintiff objected; but said objection was overruled and the same was read, and the plaintiff at the time excepted.

The defendant then offered to read in evidence Eiler's sur-vey of the town of Carondelet, being the survey mentioned in the act of the legislature of February 13, 1833; to the reading of which the plaintiff objected; but said objection was overruled by the court and the same was read, and the plain-tiff at the time excepted.

The defendant then offered to read in evidence an ordi-nance of the former town of Carondelet, passed June 2d, 1834, authorizing deeds to be made for lots within Eiler's survey; to the reading of which the plaintiff objected; but said objection was overruled and said ordinance was read, and the plaintiff at the time excepted.

The defendant then offered to read a deed from the town of Carondelet to Auguste Gamache, dated September 9, 1843, in consideration of the sum of five dollars, for the south half of block 84, in Eiler's survey, including the premises in controversy; and a deed from said Gamache to Augustus A.

Blumenthal, the defendant, for the same half block, dated July 28, 1847, in consideration of the sum of one hundred and fifty dollars. The plaintiff objected to the reading of said two deeds, but the court overruled said objection and said deeds were read in evidence, and the plaintiff at the time excepted.

The defendant then read in evidence several depositions of witnesses, tending to prove that the defendant had been in the actual, continual possession of the premises in controversy more than ten years next before the time of the commencement of this suit; that the lots in the former town were 150 feet square, and no larger; that there were only two streets besides Water street in the town prior to Eiler's survey in 1832, that is to say, Main street and Second street; that between Second street and common field the land was generally open and unoccupied, and covered with timber; that the people sometimes cut the timber for their own use, and that cattle and other live stock of the town were allowed to graze there as well as elsewhere; that during the Spanish government there was a barn on the extreme east end of the confirmation, (survey No. 125,) which was afterwards taken away; that after this Pierre Maison built a house at said extreme east end on Second street, at an early day, but since the change of government, and that there were no cross streets west of Second street until Eiler's survey in 1832. The plaintiff objected to the reading of each and every one of said depositions on the ground of incompetency and irrelevancy; but the court overruled said objection, and the plaintiff at the time excepted. The parties admit that the premises in controversy are within the exterior lines of said survey of said Eiler, Brown, and Rector, respectively.

The defendant here closed his evidence.

The plaintiff, in rebuttal, read the depositions of witnesses tending to prove that the premises in controversy are within the town of Carondelet, as the same existed prior to December 20th, 1803; that all of the land between the common field and the river formed a part of the town prior to Decem-

ber 20th, 1803, and that no part of the land within the town was common during the Spanish government; but, on the contrary, all that had no owner was vacant land for future building lots, as the town enlarged by an increase of population. These statements, contained in the depositions of the plaintiff, were strongly corroborated by the testimony of several of the depositions of the defendant, read in evidence.

The plaintiff then read in evidence the survey of the out-boundary of Carondelet, dated November 14, 1853, established according to act of Congress of June 13, 1812, purporting to include all of the town lots, common field lots, and commons of Carondelet.

The plaintiff then read in evidence the connected plat of the town of Carondelet, compiled by the surveyor general of Illinois and Missouri. This plat shows the location of the town of Carondelet as it existed during the Spanish government, and it also shows that the premises in controversy are within the town, as it existed prior to December 20th, 1803.

The plaintiff then read in evidence the confirmations by the United States of town lots in the town of Carondelet, and the United States survey thereof, to the following persons respectively, to-wit:

1. The confirmation and survey thereof to John Eugene Leitensdorfer, under Baptiste Gamache, being survey No. 22, in block 51, on said connected plat.

2. The confirmation and survey thereof to Gabriel Constant, junior, under Amable Cartrand, being survey No. 45, in block 10, on said connected plat.

3. The confirmation and survey thereof to Joseph Leduc's legal representatives, being survey No. 12, in block 31, on said connected plat.

4. The confirmation and survey thereof to Bertholomey Berthold, under Paul Robert, being survey No. 59, in block 38, on said connected plat.

5. The confirmation and survey thereof to Joseph Menard, under Lambert Lajoie, being survey No. 72, adjoining the common field, on said connected plat.

The confirmations show that the lands therein confirmed, respectively, were town lots in the town of Carondelet during the Spanish government, and the surveys of the confirmations show the respective locations of the lands confirmed, which will appear by reference to the said connected plat.

The foregoing is all of the evidence offered by either party.

The plaintiff then asked the court to instruct the jury as follows, to-wit:

1. If the jury believe, from the evidence, that the deeds, plats, documents, and other papers, read in evidence by the plaintiff, are genuine; that the respective deeds read in evidence from Joseph Bombardier to Rufus Easton, from Rufus Easton to William Russell, from William Russell to Thomas Allen, and from Thomas Allen and wife to the plaintiff, are for the piece of land of which the premises in controversy form a part; that survey No. 125, read in evidence, includes said premises, they will find for the plaintiff, unless they believe, from the evidence, that said premises are a part of the common of Carondelet, confirmed as common to the inhabitants of Carondelet, by the act of Congress passed on the 13th day of June, 1812; or, unless they find as stated in instruction number five, given for defendant.

2. If the jury believe, from the evidence, that the premises in controversy are within the town of Carondelet, as said town existed prior to December 20th, 1803, then the survey purporting to be the survey of the common of Carondelet is no evidence to show that said premises ever was common.

3. If the jury believe, from the evidence, that the plat of the town of Carondelet, read in evidence by the plaintiff, is genuine, and that the land in controversy is within said town, then said plat is evidence to show that the land in controversy never was common.

The court gave said instruction 1, 2 and 3, but added the following words to said instruction No. 1, to which the plaintiff at the time excepted, to-wit: " Or, unless they find as stated in instruction numbered five, given for the defendant."

The plaintiff also asked the court to instruct the jury as follows, to-wit:

4. If the jury believe, from the evidence, that the confirmation and survey thereof to William Russell, under Joseph Bombardier, read in evidence by the plaintiff, are genuine, they are instructed that the boundaries of the land so confirmed and surveyed are uncertain, and the title attached to no land until a survey was made, and a survey by the United States was necessary in order to vest said title and ascertain said boundaries, and consequently no statute of limitations could run against the right of the plaintiff, or those under whom he claims, until said survey was made and approved by the surveyor general; and as said survey was not made ten years before the time of the commencement of this suit, the rights of the plaintiff, and those under whom he claims, are not barred by any adverse possession of the defendant, or those under whom he claims.

5. If the jury believe, from the evidence, that the deeds, plats, documents, and other papers, read in evidence by the plaintiff, are genuine; that the respective deeds read in evidence from Joseph Bombardier to Rufus Easton, from Rufus Easton to William Russell, from William Russell to Thomas Allen, and from Thomas Allen and wife to the plaintiff, are for the piece or parcel of land of which the premises in controversy form a part; that survey No. 125, read in evidence, includes said premises, they will find for the plaintiff.

6. When the survey 125, read in evidence, was recorded and approved by the surveyor general, the title to the land therein described passed from the United States to the confirmee, or his legal representatives; and the appeal spoken of, which was taken by the defendant to the commissioner of the general land office, and the subsequent action of the commissioner thereon, were of no validity, and did not in any manner affect any right or title that said confirmee or his legal representatives had in said land.

But the court refused to give said last mentioned instruc-

tions, Nos. 4, 5 and 6, and the plaintiff at the time excepted to the decision of the court in refusing to give the same.

The defendant then asked the court to instruct the jury as follows, to-wit:

1. If the jury believe, from the evidence, that, prior to the 20th of December, 1803, the land in controversy was used by the inhabitants of the village of Carondelet as a part of the common of said village, then the same was, by the act of 13th of June, 1812, confirmed to such inhabitants, and the plaintiff is not entitled to recover.

2. If the jury find, from the evidence, that the property described in the deed from Bombardier to Easton does not include the premises in question, then they will find a verdict for the defendant.

5. If the jury find, from the evidence, that the lot in question was a town lot, and had a definite and certain location prior to any survey made by the United States, and that the defendant, and those through whom he claims, for ten years next before this action was begun, had actual, continual possession of the premises in dispute, under exclusive claim of title thereto, then the plaintiff cannot recover.

And the court gave said last mentioned instructions, Nos. 1, 2 and 5, asked for by the defendant; and the plaintiff at the time excepted to the decision of the court in giving the same.

Whereupon the jury returned a verdict for the defendant; and afterwards in due time, after the trial herein, the plaintiff filed his motion for a new trial, for the usual reasons, and

13. Because, since the trial in said cause, the plaintiff has discovered new and material evidence, which he did not know of at the time of said trial, and which would establish the right of the plaintiff to recover the premises in controversy if a new trial be granted.

And in support of said motion for a new trial, and before the same came on for hearing, the plaintiff filed his own affidavit, and the affidavit of James S. Dougherty, and Joseph Indest. The plaintiff, in his own affidavit, said that "Since

the trial in the above cause, he has discovered four witnesses, to-wit, Joseph Indest, James S. Dougherty, and two others, whose names he cannot as yet ascertain, by whom he can prove that the premises in controversy in this suit were neither in possession of the defendant, nor any one under whom he claims, for a period of eighteen months or two years at a time between the year 1847 and 1857, but, on the contrary, were open, and not occupied by any one; that he did not know at the time of said trial that he could prove said facts by said witnesses; that he caused diligent inquiry to be made before said trial for witnesses to prove said facts, but could find none, nor did he know of any until he discovered said four witnesses, hereinbefore alluded to; that if a new trial be granted, he expects to be able to procure the testimony of said witnesses at the next term of this court."

James S. Dougherty says that he is "well acquainted with block No. 84, in the city of Carondelet, and that on or before the time of the survey of that part of said block which is included in the United States survey No. 125, he visited Carondelet frequently, and saw that lot; and he says that prior to the survey, for more than a year, it was vacant, and nothing on said premises."

Joseph Indest says "that on the 15th of May, 1854, he was deputy United States surveyor for Missouri, and executed on or about that day the survey in the town of Carondelet, numbered 125, under instructions from the surveyor general, and he says that he distinctly recollects that the south part of block 84, which was included in said survey, was vacant."

And when said motion for a new trial came on for hearing, the plaintiff read said affidavit in evidence, in support of said motion; but the court overruled said motion; to which the plaintiff at the time excepted.

A title under a confirmation by the act of 1812 is better than one under the act of 1816, and in so far as the instructions instituted a comparison between the titles of plaintiff and defendant they do so correctly.

The survey of the common of Carondelet having included

the village, in which were many valid private claims, it must be understood that such claims were intended to be excepted from the common, and in this case the court properly left it to the jury to determine whether the particular premises in dispute were used by the inhabitants of Carondelet as a part of the common of that village, and on this subject the instructions given for the plaintiff leave him no ground of complaint whatever.

The instruction numbered 5, given at the instance of the defendant, correctly expressed the law as decided by this court, in the case of Aubuchon v. Ames, 27 Mo. Rep. 89, which was affirmed in the case of St. Louis University v. McCune, 28 Mo. Rep. 481, and McCune v. O'Fallon, decided at this term of the court. The plaintiff's instruction number 4, was therefore properly refused.

The instruction number 2, given for the defendant, adopts the same view taken by the plaintiff, as is shown by his instructions numbered 1 and 5. He has no right to complain of it.

The fifth instruction asked by the plaintiff was obviously wrong, and was properly refused, and the sixth was useless.

The plaintiff did not show himself entitled to a new trial upon the ground of newly-discovered testimony.

The affidavits show only that the newly-found witnesses would testify as to the continued possession of the premises in dispute. Upon this point testimony was given at the trial, and the defendant having by his answer set up continued possession as a defence to the suit, the plaintiff had long notice of such intention, and ample opportunity to hunt up such testimony on the subject as he desired.

As it concerned the possession of a lot in the city of Carondelet, many persons competent to testify, perhaps hundreds, must have known the facts as to the possession; and that the plaintiff did not find them and produce them at the trial, shows so great a lack of diligence as to forbid any indulgence to him on that account.

Judgment affirmed, Judges Bay and Dryden concurring.